## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF IOWA.

### JANUARY TERM 1846.

Hon. CHARLES MASON, Chief Justice.
" JOSEPH WILLIAMS, } Associate Judges.
" THOMAS S. WILSON, }

## Joseph Webster, plaintiff in error, vs. Hugh T. Reid, defendant in error.

### Error to Lee.

The treaty of 1824, with the Sac and Fox tribes of Indians, by which certain lands were ceded to the United States, did not include that portion of their lands lying between the rivers Desmoines and Mississippi, which was reserved for the half breeds, belonging to said tribes.

By this treaty of 1824, the half breeds had conferred upon them the right of private property in the lands reserved for their use, and not the sovreignty over them.

The title of the half breeds was not disturbed by the second treaty and cession in 1832, as the cession of lands from one nation to another, does not effect the right of private property.

The act of Congress of June 30, 1834, conferred upon the half breeds of the Sac and Fox tribes, a full fee simple title as tenants in common, to the reserved lands lying in Lee county, Iowa.

Although a legislature has not the power to destroy vested rights, it can create or augment them.

If a legislarure sees proper to violate the solemn stipulations of a treaty, there is no power in the judicary to prevent it.

If a treaty is by the constitution declared to be the supreme law of the land, so is an act of Congress. The latter may repeal the former, in the same manner that one statute may repeal another.

After the act of Congress of 1834, the half breed tract was to the fullest extent individual property, and as such, by the Organic Act, placed under the municipal regulations of the territory of Iowa.

The act of 1834, conferring on the half breeds a title, is a public statute, and should be judicially noticed.

A party to a judgment cannot collaterally impeach it for fraud, much less can a stranger be permitted thus to do it.

As a general rule, a judgment at law is an act so far conclusive, as not to be disturbed by another judgment at law.

A contract however fraudulent, is not a nullity ; it is valid as to all the parties to the fraud, and to all others except those who are injured thereby.

Judgments rendered under an unconstitutional law are not nullities; and a sheriff levying and selling under such a judgment would not be a trespasser.

This was an action of Right instituted by Reid, against Webster, in the District Court of Lee, to recover the possession of the north-east quarter, of section number twelve, in township number sixty-seven, north of range number five west, containing one hundred and sixty acres, and which is a part of the land known as the half breed tract in said county, containing one hundred and nineteen thousand acres.

As the decision in this case involves the title to all the lands lying in the half breed reservation, we shall give a somewhat detailed history of the title of Hugh T. Reid, the plaintiff below and the defendant in error.

HISTORY OF THE TITLE OF REID.—On the 4th of August, 1824, a treaty was concluded between the United States and the Sac and Fox tribes of Indians, by which the latter ceded to the United States all their lands within the limits of the State of Missouri, and which treaty contained *the following reservation :*

"It being understood that the small tract of land lying between the rivers Desmoines and the Mississippi, and the section of the above line between the Mississippi and Desmoines," (meaning *that section* of a line running from the north-west corner of the State of Missouri, east to the Mississippi, which would run from the river Desmoines to the Mississippi, and which section with said rivers bounds a triangular piece of land containing 119,000 acres) " is intended for the use of the half breeds belonging to the Sac and Fox nations ; they holding it, however, by the same title and in the same manner that other Indian titles are held."

On the 30th June, 1834, an act of Congress was approved, relinquishing to and vesting in the half breeds of the Sac and Fox tribes of Indians, who, at the passage of this act, were under the reservation in the aforesaid treaty, entitled by the Indian title to the same, all the right, title and interest which might revert or accrue to the United States in the land included in said reservation; with power to said half breeds to transfer their portions thereof by sale, devise or descent, according to the laws of the State of Missouri. Neither the treaty or act of Congress *named* the persons who were to take title under the law.

On the 16th January, 1838, the territorial legislature, with a view to ascertain who were the real owners of this tract, and to bring about a partition of the lands among the real owners, passed an act providing, among other things, for the appointment of three commissioners, who should hold their sessions at the town of Montrose, receive and record the evidence of all claimants, under the act of Congress aforesaid, of any interest in said lands; and who were required to report to the District Court for Lee county, the result of their investigations and the evidence received by them. This act also provided that said commissioners should receive $6,00 per day each, for their services, and which, with all other expenses of the commissioners, was to be paid by a sale of such portions of said tract as might be necessary to pay the same, said sales to be made on the order of the District Court, or a judge, in vacation.

Under this law, two of the commissioners actually served for near a year, and until January 25th, 1839, at which time the territorial legislature repealed the act of January 16th, 1838. No sales of land had been made at that time to defray the expenses of said commission. To meet this contingency the act of January 25, 1839, enacted as follows:

"Sec. 2. That the several commissioners appointed by, and under that act, to sit and take testimony, may immediately, or as soon as convenient, commence actions before the District Court of Lee county, for their several accounts, against the owners of the said half breed lands, and give eight weeks notice in the 'Iowa Territorial Gazette,' to said owners, of such suits, and the judge of said District Court, upon the trial of said suits before it, at its next term, shall, if said accounts are deemed correct, order judgment for the amount and costs to be entered up against said owners: and said judgment shall be a lien on said lands and a right of redemption thereto. Said judgment, when entered, shall draw interest at the rate of twelve per cent per annum.

"Sec. 3. The words 'owners of the half breed lands lying in Lee

county,' shall be a sufficient designation and specification of the defendants in said suits.

" Sec. 4. All the expenses necessarily incurred in the discharge of their duties under the above named acts, shall be included in the their accounts.

" Sec. 5. The trial of said suit or suits, shall be before the court and not a jury, and this act shall receive a liberal construction," &c.

Under this law, two of the commissioners, Edward Johnston and David Brigham, each recovered judgments in the District Court of Lee county, Iowa, vs. " the owners of the half breed lands, lying in Lee county," the former for $1,290,00 ; the latter for $818,00.

The jurisdiction of said District Courts and Supreme Court of Iowa, is thus defined in the act of Congress creating the territory : (sec. 9.) " And the said Supreme and District Courts shall possess a chancery as well as a common law jurisdiction."

On the 26th November, 1841, executions were issued vs. " the owners of the half breed lands lying in Lee county," on both of said judgments, one of which executions was levied as follows : " December 1st, 1842, levied the within execution on the half breed Sac and Fox reservation in Lee county, I. T., commonly called the half breed tract ; advertised the same for sale, for January 1st, 1842. January 1st, 1842, sold the above described tract of land ; bought by H. T. Reid for the sum of $2,884,66 ; $1,762,66 to be endorsed in full satisfaction of the within execution.

" (Signed)                  HAWKINS TAYLOR,
                               " Sheriff of Lee county."

The other was levied as follows : " Levied the within execution on the half breed tract of land situate between the Mississippi and Desmoines rivers, granted by treaty to the half breeds of the Sac and Fox tribes of Indians ; advertised same for sale January 1st, 1842. Jan'y. 1st, 1842, sold the above described tract of land ; bought by Hugh T. Reid for sum of $2,884,66 ; $1,122,00 to be endorsed on this execution.

" (Signed)                  HAWKINS TAYLOR,
                               " Sheriff of Lee county."

On the 2d January, 1843, William Stotts, then sheriff of Lee county, executed to Hugh T. Reid, a deed in pursuance of the sales aforesaid for the half breed tract, containing 119,000 acres, and describing the same by its metes and bounds, which deed was duly acknowledged and recorded.

The case was tried at the May term, 1845, of the District Court of Lee county, before Judge Mason and a jury.

Reid plaintiff, offered in evidence the aforesaid judgments of Johnston and Brigham; when defendant objected to their being received on the ground of want of jurisdiction in the court to render them; which objection was overruled and defendant filed his exception.

The plaintiff then offered in evidence the executions and levies and the deed of the sheriff, Stotts, referred to above; to the introduction of all which defendant objected; objection overruled and exception filed. The plaintiff then proved the possession of defendant at the time of service of the summons in this suit, and then gave in evidence a plat of survey of the half breed reservation duly certified from the general land office, and proved by a surveyor, who had traced the lines of this reservation, that the land in controversy was within, and a part of the reservation. The plaintiff also introduced as evidence, the laws of the territorial legislature above referred to, to wit: that approved January 16, 1838; the act supplementary thereto, approved January 22d, 1838, and the act repealing those last named, approved January 25, 1839, which was all the evidence given by the plaintiff.

Defendant then moved for a nonsuit, and mainly insisted,

1. That the plaintiff had failed to show title in the defendants to the judgment of Johnston and Brigham, inasmuch as the act of Congress, approved June 30th, 1834, which ceded the land to the half breeds, was a *private act*, and not having been given in evidence, the court could not take notice of it.

2. That the Indian title to the land had never been extinguished, and therefore it was not subject to sale on execution.

3. That the plaintiff had failed to prove that any one of the " owners " was a resident of Iowa territory during the pendency of the suits of Johnson and Brigham; and the judgments not having been rendered against any person by name; they were therefore, mere nullities, and if not nullities could not authorize an execution vs. the half breed tract in satisfaction.

4. That the laws of the territorial legislature referred to, were unconstitutional and void, and therefore the judgments rendered in pursuance of them were void.

5. That the jurisdiction of the court in respect of the suits of Johnston and Brigham was special and limited, and therefore the plaintiff should have proven the regularity of all the steps in the suits antecedent to the judgments.

Which motion for a nonsuit, the court overruled and defendant excepted thereto.

Defendant Webster then offered to prove that the judgments, executions, sheriff's deed and sheriff's sale, offered in evidence by plaintiff, were all procured by fraud of said plaintiff and others, and that the whole title of plaintiff was based upon fraud and fiction.

Which proof the court refused to receive and defendant excepted thereto.

The defendant, for the purpose of showing title in himself to the land in controversy; having given proof by hearsay from sundry persons that one Na-ma-tau-pus, was a half breed of the Sac and Fox nations; also, that certain Indians had so stated and had made oath to the fact; also, that certain persons deceased, who had married half breeds, (not proven to be related to Na-ma-tau-pus by either blood or marriage) but who were intimate with the Indians and talked their language, had stated while living, that Na-ma-tau-pus was a half breed; also, that his complexion indicated such an origin; then offered in evidence a deed from Na-ma-tau-pus to one John Bond, and from said Bond to one Theophilus Bullard, both duly executed and acknowledged, and conveying to said Bullard all the interest of said Na-ma-tau-pus as a half breed in the reservation above referred to, and also a deed from said Bullard and wife to the defendant Webster, for all of said interest, also duly executed and acknowledged.

To the introduction of which deeds in evidence, the plaintiff objected; the court sustained the objection and ruled that they should not be received, to which opinion defendant excepted.

Defendant then proved that he came into possession of the land in controversy, in 1838, under the title derived from said Na-ma-tau-pus; that at the time he purchased, there were improvements on said tract and that he took possession and has been in possession ever since.

Defendant then offered to prove by parol testimony, that no service had ever been made upon any person in the suits of Johnston and Brigham; that no notice was given, by publication of the pendency of said suits; that the plaintiff Reid, was one of the counsel who procured said judgments; that said judgments were rendered upon fictitious demands and were never proven before the auditors; that Webster and some of the other owners of the half breed tract of land, were prevented from appearing and defending said suits of Johnston and Brigham by the fraudulent representation of plaintiff; that the sales were, in fact, never

made by sheriff Taylor, and that the whole returns of sheriff Taylor on the executions were false and fraudulent.

The counsel for plaintiff objected to the introduction of any such evidence; which objection the court sustained, and ruled that such evidence was inadmissible. To which opinion and decision defendant excepted.

No further evidence of importance to the questions raised in the Supreme Court was offered by either party, and here both rested and submitted the case to the jury after argument.

Whereupon the counsel for defendant asked the court to instruct the jury as follows:

1. That unless it was proved to the satisfaction of the jury that there was some person or persons within the territory of Iowa, at the time of the issuing of the process, or who appeared at the trial, or at some stage of the proceedings, that were within the jurisdiction of the District Court of Lee county, during the pendency of the suits of Johnston and Brigham, upon which this title accrued; that owned or had an interest in those lands, they must find for the defendant.

That unless they find from the evidence that there were owners and persons or corporations, other than the government, who were owners or had an interest in said lands at the commencement of these suits by Johnston and Brigham, that they must find for the defendant.

3. That unless the jury find that some one or more of the owners of the half breed tract of land were citizens of the territory of Iowa at the time of the passage of the act of the Iowa legislature, approved January 25, 1839, or between that time and the execution of the deed by sheriff to the plaintiff, that they must find for the defendant.

4. That unless it has been proved to the jury that the defendants, sued by Johnston and Brigham, and upon whose judgments the plaintiff claims his title, were a corporation by virtue of law, and acting as such are liable as such, or a partnership firm by that name, or some kind of an association who had assumed the name of owners of the half breed lands in Lee county, that the plaintiff cannot recover.

5. That if it is not proven to the jury that the judgments of Johnson and Brigham were rendered against some person or persons, body corporate or association of individuals, whose existence has been proved to exist at the commencement of the suits or at the rendition of the judgments, that they must find for the defendant.

6. That a judgment against a dead person, or a person who has no

60

existence whatever, is no judgment at all in contemplation of law, and a sale under such a judgment is void.

Which several instructions so prayed for to be given to the jury, the court refused to give and the defendant excepted thereto.

Verdict and judgment for plaintiff, Reid.

The defendant, Webster, removed the cause by writ of error to this court.

Errors assigned :

1. The court below erred in admitting as evidence the judgment, execution, levy and return of the sheriff in the case of " Edward Johnston vs. owens, of the half freed land in Lee county," as stated in the bills of exceptions, No. 1 & 7.

2. The court below erred in admitting as evidence to the jury the judgment, execution, levy and return of the sheriff in the case of " David Brigham vs. the owners of the half breed land lying in Lee county" as stated in the bills of exceptions, No. 1 & 7.

3. The court erred in admitting as evidence to the jury, the deed, executed by William Stotts, sheriff, as set forth in the bill of exceptions, No. 7.

4. The court erred in overruling the motion of defendant below for a non suit, as set forth in bill of exceptions, No. 2.

5. The court erred in refusing to admit the defendant below to introduce evidence to prove that the judgments, executions, sheriff's sale and sheriff's deed, containing the evidence introduced by plaintiff below, was procured by fraud and fiction, as set forth in bill of exceptions, No. 3.

6. The court erred in refusing to admit the deed from Na-ma-ta-pas, to John Bond, also, the deed from John Bond to Theoppilus Bullard, and from Theoppilus Bullard and wife to defendant below as set forth, in bill of exceptions No. 4.

7. The court erred in excluding from the jury evidence to prove that no service had ever been made upon any person in the suits in which judgments were rendered in favor of Johnston and Brigham. That there had been no publication of the pendency of said suits—that plaintiff below, who was the counsel in said suits, and procured said judgments, and said judgments were rendered upon fictitious demands, were never proven before the auditors. That Webster and the owners of the half breed tract of land, or some of them were prevented from opposing and defending, by the fraudulent representation of plaintiff below. That the sale was in fact never made by Sheriff Taylor. That the whole return

of the executions by sheriff Taylor, was a fraudulent and false return, as set forth in bill of exceptions No. 5.

8. The court below erred in excluding from the jury the record of the deed from Taylor to Barrett, as referred to in bill of exceptions No. 6.

9. The court below erred in refusing the instructions severally prayed for by defendant below as stated in bills of exceptions from 1 to 8 inclusive.

MILLER & HALL, for plaintiff in error.

STARR & WALKER, for defendant in error.

PER CURIAM, MASON, CHIEF JUSTICE.—In the examination of this case we shall first enquire whether the owners of the half breed tract, had such a title to the land in controversy as to enable the purchaser at a sale on an execution against them, to maintain an action of ejectment, or its equivalent under our statute, an action of right.

In the year 1824 the Sac and Fox tribes of Indians relinquished to the United States by treaty "all their right, title, interest and claim to the lands which the said Sac and Fox tribes have or claim within the limits of the State of Missouri, which are situated lying and being between the Mississippi and Missouri rivers and a line running from the Missouri at the entrance of the Kansas river, north one hundred miles to the north west corner of the State of Missouri, and from thence east to the Mississippi, it being understood that the small tract of land lying between the rivers Des Moines and the Mississippi, and the section of the above line between the Mississippi and the Des Moines, is intended for the use of the half breeds belonging to the Sac and Fox nations, they holding it however by the same title, and in the same manner as other Indian lands are held." The land in controversy is a portion of this half breed tract.

Two or three important questions have been raised as to the effect of this treaty. In the first place, is this half breed tract thereby ceded to the United States? The cession embraces all the lands which lie in the the State of Missouri and comprehended within certain boundaries. The half breed tract is within those boundaries but not within the State of Missouri. If it was intended to cede all the lands lying within those boundaries, why prefex the description of their location being within the State of Missouri? This portion of the description was doubtless intended to have some effect and we therefore conclude that these lands which were thus dedicated to the use of the half breeds were

not by that treaty ceded to the United States; and if while that state of things existed, the beneficiaries had all become extinct, the lands would have reverted to the Sac and Fox tribes of Indians.

But in 1832, another treaty was held with these Indians, in which the following tract of country was ceded to the United States: " Beginning on the Mississippi river at the point where the Sac and Fox boundary line (as established by a previous treaty) meets that river, thence up said boundary line to a point fifty miles from the Mississippi, measured on said line; thence in a right line to the nearest point on the Red Cedar of the Iowa, forty miles from the Mississippi river; thence in a right line to a point in the northern boundary line of the State of Missouri, fifty miles measured on said boundary line from the Missiissippi river; *thence by the last mentioned boundary line* to the Mississippi river, and the western shore of said river to the place of beginning."

This cession includes the half breed tract, and shows that the parties to these treaties did not understand that tract to have been ceded by the treaty of 1824. It was however fully ceded by this treaty of 1832.

A more difficult question growing out of this treaty of 1824, relates to the title which the half breeds acquired by that treaty. They were to hold " by the same title, and in the same manner as other Indian lands are held." From this it has been contended that the half breeds were to hold this land in the same manner in all respects as though they were a nation by themselves, including the qualified right of sovereignty which the Indian tribes are permitted to exercise in their own territories; that by virtue of these treaties no new rights were acquired by the United States—the rights of the Sacs and Foxes having been merely transferred to the half breeds; that until the rights of this new nation shall have been extinguished by treaty with them, our territorial laws could rightfully exercise no control over these lands, any more than over those of the Sioux or Potawatomies, lying within our territorial limits; and that therefore the sale of the half breed tract on an execution against the owners, was an absolute nullity and gave no right of property to the plaintiff in this suit.

We do not think this a correct view of the subject. The treaty of 1824 conferred upon the half breeds the right of private property in the lands, not that of sovereignty over them. The provision that they were to hold it by the same title and in the same manner as other Indian lands are held, was intended principally if not entirely to prevent them from transferring their property without the consent of the United States, and the jurisdiction of the latter became entire and absolute.

The title of the half breeds was not disturbed by this latter treaty, inasmuch as a cession of land from one nation to another does not effect the right of private property.

On the 30th of June 1834, an act of Congress was passed declaring " that all the righ, title and interest which might accrue or revert to the United States, to the reservation of land lying between the Mississippi and Des Moines rivers which was reserved for the use of the half breeds belonging to the Sac and Fox nations, now used by them or some of them under a treaty made and concluded between the United States and the Sac and Fox tribes or nations of Indians at Washington on the 4th day of August, 1824, be and the same are hereby relinquished and vested in said half breeds of the Sac and Fox tribes or nations of Indians, who at the passage of this act are under the reservation in the said treaty entitled by the Indian title to the same with full power and authority to transfer their portions thereof by sale, devise or descent, according to the laws of the State of Missouri." Since the passage of this act but little doubt exists as to the exact nature of the half breed title. To ascertain the number of interests in this tract, their extent and who are entitled to them, may still occasion great difficulty, but when once ascertained the precise nature of their titles is easily understood, being nothing more or less than a full fee simple title, as tenants in common. It matters not what was the previous half breed tenure. To those then holding, was given the full and absolute ownership. The change effected was not beyond the scope of lawful legislation, for if as has been contended, the half breeds under the treaty were each individually entitled to a life occupancy, the change affected by this act of 1834 is no greater than though estates in tail had been changed into fee simple titles. Although a legislature may not have the power to destroy vested rights, it can create or augment them, even though the interest of posterity should be effected thereby.

Nor is it material, so far as the efficacy of this act of 1834 is concerned, whether or not it violates the treaty of 1824, by making a different disposition of those lands from what was stipulated for in that treaty. Government is certainly under the strongest moral obligation to preserve inviolate the faith of all treaties, but if the legislative power which in such matters is sovereign, sees proper to violate this duty, there is no power in the judiciary to prevent it. True, a treaty is by the constitution declared to be a supreme law of the land, but so is an act of Congress. The latter may repeal the former in the same manner that one statute may repeal another. It is an act of sovereignty, which if the

judiciary could arrest they might paralize all the energies of war itself, on the ground that the declaration of war was a violation of treaties.

Since the taking effect therefore of the act of 1834, the half breed tract has been to the fullest extent individual property, and as such was by the organic act of the territory placed under our municipal regulations. Any other construction would lead to the most serious inconveniences. The act just referred, to authorized the alienation of the interests of the half breed owners, and it is a well known fact that to a very considerable extent they have already availed themselves of this privilege. Is that whole tract now and forever hereafter to be exempt from taxation and from sale under execution whether in the hands of the half breeds themselves or of their assignees? This it seems to us would be the effect of establishing the principles contended for by the counsel for the plaintiff in error, for if those lands are not now subject to our laws when will they become so? It has been seriously doubted whether an express stipulation on the part of the State to exempt certain Indian lands forever from taxation, was such a contract as to be placed beyond the reach of future legislation. The case of the State of New Jersey vs. Wilson, 7th, Cranch R. 164, however established that principle, but the court in that case went to the verge of judicial power. The principle contended for here would, by a very unnatural and unnecessary inference not only exempt these lands from taxation, but place them beyond the range of all territorial or State legislation.

But it has been contended that the act of 1834 is a private statute, and therefore not now to be noticed as it has not been set forth in the pleadings or the proof. We have had more serious doubts upon this subject than upon any other part of the case, but have come to the conclusion that it is such a statute as should be judicially noticed.

The rule followed in Kentucky has sound reason to support it, that in this country where all laws public as well as private are published in the statute book, the distinction between public and private statutes should no longer be preserved, 2d Pirtle's Digest 19. The main reason of the English rule has certainly ceased, 3d Tomlin, 519.

But is this statute private? A statute is public which concerns the whole people, 7 Mass. R. 9, 10 Mass R. 9. and 92. This act surrenders to the half breeds the revertionary interest, and yields up the preemption right which the United States then had in this tract of land. So that although in regard to the half breeds it is a private statute yet in regard to the rights of the government, that is to say the people, it is a public law.

We shall next proceed to enquire into the correctness of the decision of the court below rejecting the proof " that the judgment, execution, sheriff's sale and sheriff's deed, constituting the evidence introduced by the plaintiff were all procured by fraud, by the said plaintiff and others, and that the whole title of the plaintiff was based upon fraud and fiction."

The general rule that fraud vitiates all judgments as well as contracts is to be taken with some qualifications. If vitiated, that fact cannot be shown on all occasions and by all parties. Although a contrary opinion has been sometimes entertained, the more recent and sounder doctrine seems to be that a party to a judgment cannot collaterally impeach it for frauds ; 4th Scammon's R. 371 ; 8th Ohio R. 108 ; 22d Maine R. 130 ; 3d Johnson R. 168. Much less would a mere stranger be thus permitted to impeach it.

As a general rule a judgment at law is a conclusive act, so far as not to be disturbed or even enquired into in another proceeding at law. Although obtained by fraud it is valid, until by a direct proceeding in chancery instituted for that purpose, the remedial power of that court is invoked, and the injustice which the rigid rules of the common law would enforce is prevented.

But even a mere contract, however fraudulent, is not a nullity. It is valid to the parties to the fraud themselves and as against all others, except those who have been directly injured thereby. If therefore a judgment were of no higher nature than a simple contract, Webster did not show himself in a condition to object to it for fraud. It was not sufficient that he had an adverse possession of the land in controversy. A defendant in ejectment has generally such a possession. Still where he shows no title he will not be permitted to prove the forgery of the deed on which the title of the plaintiff rests. Adams Ejectm't 29 note.

What has now been said in relation to the defendant below not being permitted to show fraud, applies with still greater force to the objection that he was not allowed to show irregularity in the proceedings, as that there was no service nor publication, nor demands proved before the auditor, &c. A writ of error would have been the appropriate mode of proving defects of such a nature, and no one but a party thereby injured could even there successfully seek a remedy.

Similar in character are the objections that have been raised on the ground of the unconstitutionality of the acts of the legislature, through which the indebtedness accrued and the judgments were obtained. 16 Pickering R. 87.

Judgments rendered under an unconstitutional law are not nullities. A sheriff levying and selling under such a judgment would not be a trespasser. 1st Chitty 210 and note. And this seems to be a test upon that subject, 3d Peters R. 193.

The case becomes still stronger when lands have been sold under such a judgment and transferred to the purchaser. If the defendant is willing to have his debt paid by the sale of his property under such a judgment, shall a stranger be allowed to interfere and disturb that arrangement? If this were permitted, the purchaser at a sheriff's sale holds his property for twenty years, at the mercy of any intruder who shall discover that the law under which the judgment was obtained was unconstitutional, 10th Peters R. 471 ; 16th Pickering, 87.

Such a rule would produce the greatest inconvenience, by rendering titles insecure, as well by discouraging persons from purchasing at such sales.

The sacrifice at which the defendant's property must be sold could not be prevented by any waiver on his part, because the law would permit some troublesome neighbor to set aside the judgment, which it might be the wish as well as the interest of both parties interested to have remain firm an effectual forever. The law will not thus countenance impertinence and intermeddling.

Nor is the reason of this rule modified in the least by the fact, that the defendant below held the land in controversy by an adverse possession. Such a possession is within the reach of every intruder, and would (were a contrary rule to prevail) effectually protect his possession, if he could avoid the force of a writ of forcible entry and detainer.

What difference in fact can it make to the defendant below, whether the action against him be brought by the plaintiff below or by any other " owners of the half breed tract ?" The true rule in all these cases seems to be that unless the defendant in ejectment has some defence that would be good against the former owner he cannot object to a forged or fraudulent deed, nor to the fraud irregularity or unconstitutionality of the proceedings by which the present owner has acquired title.

As corrollaries to the conclusions attained as above, it follows that the court below did not err in admitting evidence of the judgment, execution, levy and return of the sheriff, nor in admitting the sheriff's deed, nor in overruling the motion for a nonsuit, as set forth in the first, second and seventh bills of exceptions.

The next point to be considered in the proof of title derived from Na-ma-tau-pus, which was profered by the defendant below and rejected by

the court. It is very questionable whether such proof should have been admitted even if Na-ma-tau-pus had been fully proved to have been one of the Sac and Fox half breeds. The title of the land was in the hands of a purchaser under a sale directed by a court of general jurisdiction. If that judgment were irregular, fraudulent or founded upon an unconstitutional law, could one of the parties to the judgment obtain a remedy in this collateral manner?

But even if the law should permit such a course, we think there was no sufficient evidence that Na-ma-ta-pas was one of the Sac and Fox half breeds. The principal witness on this subject was one who did not understand the Indian language. He stated that on one occasion he was in company of several whites and Indians, and that then this individual was said to be a half breed of the Sac and Fox tribes; at another time the witness took the acknowledgment of the deed from Na-ma-tau-pus, when he heard several persons (a part of whom were under oath) state that they believed him a half breed of the Sac tribe. His complexion indicated a half breed. Witness had also heard some persons who had married half breeds make similar statements as to his pedigree. From the necessity of the case the same strictness of proof is not required in relation to pedigree as for most other purposes, still the same general rules are observed.

The best evidence which the nature of the case admits, is required where hearsay evidence in such case is allowed. It is the statements of relatives by blood or marriage, who are generally best acquainted with the facts they state.

No evidence of that kind was offerred in the present case. But even if the peculiar habits and manners of the Indians be such as to require a further modification of the rule of evidence, at least general reputation in the tribe might have been proved by persons who could understand the language. Bullard stated that several persons had informed him that such reputation existed. The original hearsay would have been infinitely better evidence than this hearsay of a hearsay.

The principles involved in the instructions asked and refused by the court, have already been substantially discussed. If the conclusions above stated are correct, there was no error in refusing the instructions.

Judgment affirmed.